[Civ. No. 69535. Second Dist., Div. Two. Jan. 20, 1984.]

HARRY JOHN KLEKAS, Plaintiff and Appellant, v.
EMI FILMS, INC., et al., Defendants and Respondents.

COUNSEL

Berger, Kahn, Shafton & Moss, Margot P. Demopoulos and Harry John Klekas, in pro. per., for Plaintiff and Appellant.

Youngman, Hungate & Leopold, Louis P. Petrich and Scott A. Handelsman for Defendants and Respondents.

## Opinion

**COMPTON, Acting P. J.**—Plaintiff Harry John Klekas instituted this action against defendants EMI Films, Inc., et al. to recover damages allegedly arising out of the unauthorized use of his unpublished literary work entitled "The Fields of Discontent." The complaint generally avers that plaintiff's work served as the basis for the production of the critically acclaimed motion picture "The Deer Hunter" and the subsequent publication of a paperback book of the same title. Following the completion of discovery by the litigants, the trial court granted defendants' motion for summary judgment and dismissed the complaint. This appeal follows. We affirm.

After a thorough review of the record and the applicable law, we conclude, as did the court below, that a substantial portion of plaintiff's case based on state law has been preempted by federal law and as to the portion of the case which is cognizable by state law there exists no factual dispute.

There is little conflict in the evidence. ■ Since this is, however, an appeal from a summary judgment, where such conflict appears in the papers submitted in support of and in opposition to the motion, we resolve those conflicts in favor of the nonmoving party (plaintiff herein). (*LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 744-745 [176 Cal.Rptr. 224]; *MCA Records, Inc.* v. *Newton-John* (1979) 90 Cal.App.3d 18, 21 [153 Cal.Rptr. 153].)

The evidence before the court at the time it ruled on defendants' motion revealed the following:

Plaintiff, regularly employed as a court bailiff in Salt Lake City, Utah, completed the first draft of his novel in early 1970. The story, generally dealing with the return of a soldier to his hometown after 20 years of military service, was memorialized in a 180-page typed manuscript. In January or February of 1971, plaintiff forwarded a copy of the work to defendant Anthony Fiato, a friend with reported contacts in the film industry who claimed that he might be able to help market the book. Plaintiff, however, had no further discussions with Fiato until late 1975. In November of that year, Fiato visited plaintiff at his home in Utah and indicated that he was taking the manuscript with him to Los Angeles where he planned to meet with an actor who might somehow help in publicizing the work.

During his visit, Fiato also suggested several changes in the story line which he believed would add to the dramatic development of the novel and increase its marketability. Plaintiff replied that he would consider the suggestions. He then requested that Fiato, during his trip to Hollywood, contact a literary agent named Fred Spector and a director named William Graham. Plaintiff did not speak with Fiato again until after the release of "The Deer Hunter" in 1979. At that time, plaintiff called Fiato and accused him of being involved in "ripping off" his literary effort for use in connection with the film. Fiato did not deny the accusation and indicated that he would go to Los Angeles to "see what he could do to straighten things out." Plaintiff has not heard from or seen Fiato since their last conversation in 1979.

Plaintiff had met William Graham sometime in 1973, when the director hired him to play a small role in a motion picture that was then in production. In the hope of generating interest in his novel, plaintiff gave Graham a copy of "The Fields of Discontent." Since Graham was represented by Fred Spector of the William Morris Agency he suggested that plaintiff contact the agent regarding another novel that plaintiff had authored entitled "The White Carnation." At no time, however, did Graham or Spector do anything to promote "The Fields of Discontent." There is no indication in the record that either of the two men ever read plaintiff's work.

Soon after completing the first draft of his novel, plaintiff mailed a copy to a former girlfriend, Jan Duplain, who was then employed by the Columbia Broadcasting System (CBS). Sometime later, Duplain informed plaintiff that she had shown the manuscript to two individuals who worked in the story department at CBS' New York office. Although the novel was subsequently returned to him by Duplain, plaintiff was never contacted by anyone at CBS concerning the purchase of the story. CBS, however, apparently acquired the television rights to "The Deer Hunter" before it was produced.

In 1976, plaintiff obtained a listing of publishing companies entitled "Writers Market" and began sending letters and materials concerning "The Fields of Discontent" to some of the publishers named in the directory. One of those publishers was defendant Harcourt Brace, which published a paperback novelization of "The Deer Hunter" subsequent to the film's release. The record is unclear, however, as to whether plaintiff sent Harcourt merely a synopsis of the work or portions of the manuscript itself. Sometime in 1976, plaintiff was notified by postcard that the publishing company was not interested in the novel.

The screenplay for "The Deer Hunter" was conceived and written by defendants Deric Washburn and Michael Cimino between November 1976

and January 1977. It was based, in part, on a screenplay entitled "The Man Who Came to Play" written by defendants Louis Garfinkle and Quinn Redeker in 1975. The motion picture was directed and filmed by Cimino for EMI Films, Inc. in mid-1977 and then distributed by defendant Universal City Studios, Inc. in December 1978. Following the movie's general release in February 1979, Harcourt Brace Jovanovich, Inc. published its novelization of the screenplay.[1]

Plaintiff's complaint for damages, filed in February 1980, alleged causes of action for plagiarism, quasi-contract, breach of implied-in-fact contract, breach of a confidential relationship, and the imposition of a constructive trust. As previously noted, defendants moved for summary judgment, claiming that neither the screenplay, the film, nor the novelization of "The Deer Hunter" were substantially similar to any protectible material or expression in plaintiff's work. It was further argued that plaintiff had failed to establish sufficient access to maintain his actions for common law copyright infringement and quasi-contract.

In sustaining the motion, the trial court concluded that plaintiff's cause of action for plagiarism had, in part, been preempted by the federal Copyright Act of 1976 and that it therefore lacked subject matter jurisdiction over any claims relating to either the film or the book. After determining, however, that it did have jurisdiction over the screenplay, the court found as a matter of law that there was no substantial similarity between that work and plaintiff's novel. Based upon these findings, the court ruled that it was unnecessary for it to consider whether plaintiff had established defendants' access to the work. All other issues were resolved in favor of defendants and the court entered a judgment of dismissal.[2]

The threshold issue to be resolved on this appeal concerns the impact of the Copyright Act of 1976 (see 17 U.S.C. § 101 et seq.) upon plaintiff's cause of action for infringement of his literary work.

Prior to the passage of the 1976 act, there existed a dual system of federal and state copyright law. Unpublished works—those in limited distribution and unavailable to the general public—were protected by state common law copyright. In this regard, Civil Code section 980, subdivision (a) provides as follows: "The author or proprietor of any composition in letters or art

---

[1]Both parties agree that the screenplay, the film, and the novelization of "The Deer Hunter" are similar as to plot, theme, and character development.

[2]Plaintiff's cause of action for breach of confidence was stated only against defendant Anthony Fiato and several fictitiously named "Doe" defendants. Neither Fiato nor any other party was served with process or has appeared in relation to that claim. It is not therefore a subject of this appeal.

has an exclusive ownership in the representation or expression thereof as against all persons except one who originally and independently creates the same or a similar composition."[3]

The common law rights recognized under the statute continue until the creator allows a "general" publication of his work to occur; the work then passes into the public domain and, unless the creator has obtained a statutory copyright, anyone can copy, distribute or sell it for his or her own benefit. (Civ. Code, § 983; see also *Carpenter Foundation* v. *Oakes* (1972) 26 Cal.App.3d 784 [103 Cal.Rptr. 368]; *Read* v. *Turner* (1966) 239 Cal.App.2d 504 [48 Cal.Rptr. 919, 40 A.L.R.3d 237]; *Smith* v. *Paul* (1959) 174 Cal.App.2d 744 [345 P.2d 546]; *Strout Realty* v. *Country 22 Real Estate* (W.D.Mo. 1980) 493 F.Supp. 997.) Prior to the enactment of the 1976 law, federal copyright protection was afforded to a work for a period of 28 years, renewable once.

■ Congress, by passing the 1976 act, intended to abolish this dual system of common-law copyright for unpublished works and statutory copyright for published works, and to adopt a single system of federal statutory copyright from "creation," that is, from the time a work is "fixed" in a copy or phono record for the first time. (See 1 Nimmer on Copyright (1983) § 1.01[B], P. 1-08; H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. 129-131 (1976)). Section 301, subdivision (a) of the act provides: "On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, *whether created before or after that date and whether published or unpublished,* are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statute of any State." (Italics added.)[4]

Enactment of this new law, however, did not affect any rights a plaintiff may have had based on a theory of common law copyright if the cause of action arose "from *undertakings commenced* before January 1, 1978." (17 U.S.C. § 301(b)(2); italics added.) The difficult question is what is meant by the phrase "undertakings commenced before January 1, 1978." (See

---

[3]Civil Code section 980, subdivision (a) was amended by the Legislature in 1982 and now provides in pertinent part as follows: "(1) The author of any original work of authorship that is not fixed in any tangible medium of expression has an exclusive ownership in the representation or expression thereof as against all persons except one who originally and independently creates the same or similar work. . . ."

[4]The 1976 act changed the duration of copyright protection to life of the creator plus 50 years.

*Strout Realty* v. *Country 22 Real Estate,* 493 F.Supp. *supra,* at p. 1000.) Legislative history offers some guidance. While the House Report does not define the phrase, it does state that "causes of action arising under state law before the effective date of the statute" are unaffected by the 1976 statute. (H.R. Rep. No. 94-1476, 94th Cong. 2d Sess. 132 (1976).)

Federal court decisions, however, have not been consistent. Two district court opinions seem to indicate, without significant analysis, that the act did not abrogate claims when the *plaintiff's work* had been created before January 1, 1978. (*Orth-O-Vision, Inc.* v. *Home Box Office* (S.D.N.Y. 1979) 474 F.Supp. 672, 684), or when the defendant "began the creation" of his work before that date. (*DC Comics, Inc.* v. *Filmation Associates* (S.D.N.Y. 1980) 486 F.Supp. 1273, 1278.) Plaintiff herein relies upon these cases to argue that since he wrote his novel "The Fields of Discontent" before January 1, 1978, federal law cannot preempt his claim. He thus urges that the date that the defendant allegedly committed the plagiarism is legally irrelevant in determining the applicability of the new federal statutory scheme.

We reject plaintiff's analysis and instead adopt the view articulated by several federal appellate courts as well as federal district courts. (*Mention* v. *Gessell* (9th Cir. 1983) 714 F.2d 87; *Burke* v. *National Broadcasting Co., Inc.* (1st Cir. 1979) 598 F.2d 688; *Birnbaum* v. *United States* (2d Cir. 1978) 588 F.2d 319 [47 A.L.R. Fed. 259]; *Bromhall* v. *Rorvik* (E.D.Pa. 1979) 478 F.Supp. 361; *Strout Realty, Inc.* v. *Country 22 Real Estate, supra*; *Meltzer* v. *Zoller* (D.N.J. 1981) 520 F.Supp. 847, 854.) (See also 1 Nimmer on Copyright (1983) § 1.01[B][3], p. 1-27.) ■ We hold that the date when the plaintiff created or began creation of the work which was allegedly subsequently plagiarized by the defendant is of no legal significance. What is dispositive, however, is the date the alleged plagiarism occurred. We find it difficult to conceive of how a "cause of action" can arise before there has been some activity by the defendant which compromises plaintiff's work.

If defendants' acts occurred after January 1, 1978, then the federal statute applies so as to preempt any claim plaintiff may have based upon a common law copyright theory. If, on the other hand, defendants' unauthorized copying occurred prior to January 1, 1978, plaintiff may still pursue a claim predicated upon state law.

■ Turning to the facts of the instant case, the trial court found that to the extent that plaintiff had any action for infringement with respect to the screenplay of "The Deer Hunter" it arose in 1976 or 1977 when that particular treatment was written (see *Golding* v. *R.K.O. Pictures, Inc.* (1950) 35 Cal.2d 690, 699 [221 P.2d 95]; 3 Witkin, Summary of Cal. Law

(8th ed. 1973) Personal Property, § 31, p. 1641.) The trial court thus properly determined that it could adjudicate this claim.

The distribution of the film and the publication of the novel, however, occurred after January 1, 1978. The trial court thus correctly concluded that any claim based on those activities was covered by the federal statute. ■ We now turn to the question of whether the court properly granted defendants' motion for summary judgment as to the claim based on the screenplay.

In order for the complaint to state a cause of action for plagiarism, there must be some substantial similarity between the screenplay and the protectible portions of plaintiff's work. (*Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 791 [256 P.2d 947]; *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 634 [180 Cal.Rptr. 522].) ■ Abstract ideas, however, are not entitled to protection by a tort action for plagiarism.[5] (See also 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 35, p. 1647.)

■ The material allegedly used by defendants must also constitute protectible property if plaintiff is to recover in quasi-contract. (*Weitzenkorn v. Lesser, supra,* 40 Cal.2d at p. 795; *Mann v. Columbia Pictures, Inc., supra,* 128 Cal.App.3d at p. 634.) ■ "Therefore, the proof necessary to recover upon the theory of a contract implied in law is the same as that required by the tort action for plagiarism." (*Weitzenkorn v. Lesser, supra,* 40 Cal.2d at p. 795.)[6]

■ In determining whether the similarity which exists between a copyrighted literary, dramatic, or musical work and an alleged infringing publication is due to copying, the common knowledge of the average reader, observer, spectator or listener is the standard of judgment which must be used. (*Stanley v. Columbia Broadcasting System* (1950) 35 Cal.2d 653, 662 [221 P.2d 73, 23 A.L.R. 2d 216]; *Zachary v. Western Publishing Co.* (1977) 75 Cal.App.3d 911, 919 [143 Cal.Rptr. 34].) For purposes of comparison therefore the works must be viewed as a whole "without dissection and without expert or elaborate analysis." (See *Burtis v. Universal Pictures*

---

[5]An action for plagiarism may prevail only if similarities exist with respect to "protectible expression." Ideas, titles, themes, locales, and even the basic plot do not constitute protectible material. (*Weitzenkorn v. Lesser, supra,* 40 Cal.2d at p. 789.) Whether or not a protectible interest exists "depends upon the originality of form and manner of expression, the development of characterizations and sequence of events." (*Id.*)

[6]We assume for the purposes of this discussion, as have the parties in their briefs, that plaintiff owns a protectible interest in "The Fields of Discontent" and that, if such interest had been copied by defendants, plaintiff would have been damaged. We therefore direct our attention to the question of whether there remains any triable issue of fact on the issue of copying by defendants.

*Co., Inc.* (1953) 40 Cal.2d 823, at p. 833 [256 P.2d 933]; *Stanley v. Columbia Broadcasting System, supra,* at p. 662.

 As previously pointed out, "The Fields of Discontent" is essentially the story of a decorated soldier who returns to his home town after 20 years of military service and rediscovers his childhood love, the loss of which had been the catalyst for his joining the army. The events which comprise the bulk of the novel occur in a small mill town, Magna, Utah, over a six-day period. Upon his return, Leonidas, the principal character in the story, is warmly greeted by his family and friends and begins his readjustment to civilian life. In various dramatic sequences, he discusses war, drugs, urban decay, pollution, the evils of television, the comforts of society and love. The horrors of war are emphasized in a series of flashbacks which depict Leonidas' combat experiences in Vietnam and Korea. As the story progresses, Leonidas is reunited with his highschool sweetheart, Rachel, and they rediscover their deep love for each other. After the couple wed, Leonidas decides to reenlist for another 10 years of military service.

In "The Deer Hunter" the story begins in a small Pennsylvania mill town where three young men (Michael, Nick and Steven) have volunteered for service in the army and action in Vietnam. The screenplay depicts each of these principal characters as average men with traditional values: their lives are defined by work, family, church and a love of hunting. The pattern and texture of their lives is marked by a series of rituals that dramatically serve to define the personalities of each man. Two years after leaving their tight-knit community for war, the three men are reunited on the battle field only to be captured by the Viet Cong. As prisoners they are forced into playing Russian roulette and made to place against their temples a revolver loaded with only one bullet and to pull the trigger. Eventually escape is maneuvered, but one of the three, Nick, goes AWOL in Saigon.

Michael returns to Pennsylvania a decorated hero, while his friend Steve begins to cope with life as an amputee, both of his legs having been lost in battle. For Michael, the emptiness of his heroism leaves him disassociated from ordinary life. He eventually falls in love with Nick's fiance. After learning that Nick is being paid to play Russian roulette in South Vietnam, Michael returns to Saigon as it is falling at the end of the war, only to see Nick shoot himself in a game. Michael takes Nick's body home, where he is buried by his family and friends. The story concludes when, at an impromptu mourning party held in a bar belonging to one of Michael's friends, the assembled group leak slowly into a choric rendition of "God Bless America."

Even a casual reading of either "The Fields of Discontent" or "The Deer Hunter" makes it clear that both works deal generally with the subjects of

friendship, courage, honor and the effect of war on the human spirit. Such topics, however, are not protectible material in and of themselves. (*Weitzenkorn* v. *Lesser, supra,* at p. 789; *Ware* v. *Columbia Broadcasting System, Inc.* (1967) 253 Cal.App.2d 489, 491 [61 Cal.Rptr. 590].) Indeed, they form the basis for countless works dating back for centuries.

As recognized by our Supreme Court, there are a limited number of ideas and themes available for use in literary material, and, therefore, those ideas and themes are shared by all literature. "It has been said (and does not appear to have been successfully challenged) that 'There are only thirty-six fundamental dramatic situations, various facets of which form the basis of all human drama.' . . . It is manifest that authors must work with and from ideas or themes which basically are in the public domain." (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 741 [299 P.2d 257].)

After a thorough review of both literary works, we can only conclude that there are substantial differences between them, especially in the use of contexts, characters and language through which the themes are expressed. (Cf. *Jason* v. *Fonda* (C.D.Cal. 1981) 526 F.Supp. 774, affd. (9th Cir. 1982) 698 F.2d 966.)

Plaintiff, however, points to well over 23 similarities between his novel and defendants' screenplay.[7] These claimed similarities are either strained or devoid of any legal significance. Both works, of course, possess certain similarities that necessarily flow from a common theme, in this instance, elements that are common in any story about soldiers returning home from war. These sequence of events, frequently referred to as *scenes a faire,* do

---

[7]We list here some of the similarities that plaintiff deems controlling: "(1) In each work the protagonist is a meditative man who is returning home from military service. (2) On the first night of his return, the protagonist in each work is driven home by a male black taxicab driver. (3) The protagonist in each work makes an impromptu decision not to go home that first night, but rather, elects to spend the night alone in an undistinguished roadside motel. (4) In each work the protagonist becomes romantically involved with a woman he knew prior to his military service and that romance is the subject of the subplot. (5) The setting in each work is a contemporary American mill town located at the base of a mountain range; in one work, some of the townspeople are discernibly Slavic, in the other, Greek. . . . (8) In each work, the protagonist and his friends go deer hunting; there is a ritualistic symbolism to the hunt. (9) In one work, a loaded gun is passed from the protagonist to another character; in the other, the protagonist plays Russian roulette. (10) The protagonist in each work philosophizes, commiserates and socializes with a regular group of friends in an intimate neighborhood bar. (11) The neighborhood bar in each work is the setting for a poignant scene in which the protagonist and his friends spontaneously sing 'God Bless America.' . . . (13) In each work a dance is held to celebrate the return of the soldiers; at that dance, an amorous character dances with one hand cupping the seat of his partner. (14) Each work includes combat scenes, including the ruthless maiming and slaughter of innocent Vietnamese civilians; one work depicts these scenes in flashback, the other chronologically. . . . (21) In each work the protagonist is pursued by the experience of war. . . . (23) In each work the protagonist drives a used Cadillac."

not constitute protectible material. (See *Weitzenkorn* v. *Lesser, supra,* at p. 789; *Columbia Pictures Corp.* v. *National Broadcasting Co.* (S.D.Cal 1955) 137 F.Supp. 348, 353.)

The court's observation in *Dellar* v. *Samuel Goldwyn, Inc.* (2d Cir. 1945) 150 F.2d 612, 613 is applicable here. "The action as a whole has been built up, partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism."

When analyzed as a whole, the screenplay of "The Deer Hunter," is, as a matter of law, substantially dissimilar to plaintiff's novel. The trial court therefore properly granted summary judgment in favor of defendants and dismissed the actions for plagiarism and quasi-contract. Under the circumstances, there was no need for the court to reach the question of defendants' access to plaintiff's work. (See *Weitzenkorn* v. *Lesser, supra,* at p. 791; *Golding* v. *R.K.O. Pictures, Inc., supra,* at pp. 695-696.) There was no abuse of discretion in this regard.

■ Finally, we address plaintiff's contention that his dealings with defendants, and more specifically with Harcourt Brace, gave rise to a claim for breach of an implied-in-fact contract.

■ To establish an implied-in-fact contract, the plaintiff must show: that he or she prepared the work; that he or she disclosed the work to an offeree for sale; that under all circumstances attending disclosure it can be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered (i.e., the offeree must have the opportunity to reject the attempted disclosure if the conditions were unacceptable); and the reasonable value of the work. (*Desny* v. *Wilder, supra,* 46 Cal.2d at p. 744; *Faris* v. *Enberg* (1979) 97 Cal.App.3d 309, 318 [158 Cal.Rptr. 704].)

■ Applying these elements to the case at bench, we find that the trial court correctly determined that there was no triable issue of fact on the cause of action for an implied-in-fact contract. In this regard, the court concluded that "no contract existed between plaintiff and any of the moving defendants with respect to the use of plaintiff's literary work 'The Fields of Discontent' and . . . defendants made no use of any material portion of 'The Fields of Discontent' in the 1977 screenplay . . . ."

Each of the court's findings is amply supported by the record. Of the four claimed routes of access urged by plaintiff, only one involved a submission

to a defendant and that was to a defendant, Harcourt Brace, that had nothing to do with the writing of the screenplay or the production of the film.

■ "The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue." (*Desny* v. *Wilder, supra,* 46 Cal.2d at p. 739.)

■ Although plaintiff may have submitted his literary effort to one of the named defendants, there is nothing in the record to establish the use of that work in the writing or making of "The Deer Hunter." (Cf. *Ware* v. *Columbia Broadcasting System, Inc., supra,* 253 Cal.App.2d at pp. 495-496.)

Based upon the foregoing, we must conclude that there was no basis for imposition of a constructive trust, and that as a matter of law plaintiff was entitled to take nothing by his complaint. The motion for summary judgment was properly granted. Plaintiff's remaining contentions do not warrant further discussion.

The judgment is affirmed.

Beach, J., and Gates, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 2, 1984.