[No. B003486. Second Dist., Div. Six. Aug. 24, 1984.]

ROBERT H. JACOBS, INC., Plaintiff and Appellant, v.
WESTOAKS REALTORS, INC., et al., Defendants and Respondents.

638

**COUNSEL**

Myron Roschko for Plaintiff and Appellant.

David J. Suttora and Kohlbrand, Suttora & Lambert for Defendants and Respondents.

OPINION

**GILBERT, J.**—Plaintiff Robert H. Jacobs, Inc. appeals from the judgment for defendants granted by the trial court after presentation of plaintiff's case. (Code Civ. Proc., § 631.8, subd. (a).) We affirm the judgment and hold that architectural plans derive copyright protection under the Federal Copyright Act which preempts state common law copyright.

FACTS

On December 1, 1978, plaintiff Jacobs and defendant Westoaks Realtors, Inc. (Westoaks) agreed by two similar contracts that Jacobs would provide architectural services for the construction of two homes on adjacent lots in Thousand Oaks. Jacobs' fee was $6,500 per lot. Jacobs drafted the contracts which contained the following clauses: "The original tracings as instruments of service are the property of the Architect and are intended for use on the aforementioned lot. The Owner may at his cost revise these drawings with the Architect's written approval for other lots." The contracts did not expressly prohibit assignment of copies of the tracings (plans) to others.

Jacobs prepared the tracings, Westoaks paid his fee, and on February 20, 1981, Jacobs filed his plans for city approval and applied for a building permit declaring himself responsible architect.

The approved plans that Jacobs provided Westoaks contained a legend declaring the plans were not transferable. By this time, however, Westoaks had performed by paying Jacobs his $13,000 fee.

Several months later Jacobs visited the construction sites and discovered the homes were not being built according to his plans. Further, he believed that certain construction practices violated the building code. Upon checking with the city building department that day, he learned that Oscar Schuster now owned the lots and had modified Jacobs' plans.[1] A second building

---

[1]The modified plans relocated the fireplace, eliminated the recessed conversation pit, steepened and heightened the roof, modified the stairway, squared-off clipped corners in the rooms, dropped the ceilings and changed the floor plans. Jacobs contended the houses were structurally unsound and lacked a fireproof roof. He also challenged construction framing practices which could expose the houses to additional fire, wind, or earthquake damage. Although alerted by Jacobs to the possibility of construction deficiencies, the city approved construction of the houses after its usual course of periodic inspections.

permit stated that Schuster owned each lot and declared Jacobs as the responsible architect.

Jacobs apprised the building department of the alleged construction deficiencies and objected to his name being on the second permit. The city then contacted Schuster who agreed to supply the name of an architect or civil engineer to accept responsibility for the construction.

A city inspector monitored the construction of the houses and they were completed and approved in December 1981. One month after completion, Schuster provided the name of a responsible civil engineer for the plans and the permit. The city then struck Jacobs' name from the documents in its file.

Rick Principe, an officer of Westoaks, testified that Westoaks agreed to sell the lots and plans to Schuster before Jacobs obtained the first building permit and that Jacobs had been apprised of the sale several times. Jacobs denied knowing of the sale to Schuster until checking with the building department on the day he discovered construction was not proceeding as he had designed.

Principe and Jacobs both testified that Jacobs had designed houses for Westoaks on other lots and Westoaks had sold those lots and plans before construction. Jacobs further testified that on one occasion he objected to this practice.

Jacobs registered his original architectural plans with the federal copyright office on November 24, 1981, and shortly after filed this action for breach of contract, indemnification, civil conspiracy, and common law copyright infringement. After a defense motion for judgment, the trial court found that Westoaks had a license to use the plans; the contracts did not prohibit assignment of this license; Westoaks assigned the license to Schuster; the contracts did not prohibit modification of the plans; the action for indemnity was premature as Jacobs had not been held liable by third parties for unsafe design; the action for civil conspiracy failed due to lack of proof that defendants committed a tort; and, there was no violation of Jacobs' common law copyright because the license was validly assigned to Schuster.

Jacobs admits the indemnity action is premature (*Sunset-Sternau Food Co.* v. *Bonzi* (1964) 60 Cal.2d 834, 843 [36 Cal.Rptr. 741, 389 P.2d 133]) but appeals the trial court's findings on the remaining causes of action.

## DISCUSSION

■ Our perspective on appeal of a judgment made pursuant to Code of Civil Procedure section 631.8[2] is to view the evidence most favorably to respondents and to examine whether substantial evidence exists to support the judgment. (*Rodriguez* v. *North American Rockwell Corp.* (1972) 28 Cal.App.3d 441, 447 [104 Cal.Rptr. 678].) ■ A review of the evidence relating to common law copyright infringement, however, is unnecessary because the Copyright Act of 1976 (17 U.S.C. § 101 et seq.) abolished Jacobs' cause of action.[3]

The 1976 Copyright Act intended to abrogate the dual system of state common law copyright for unpublished works and federal statutory copyright for published works in order to establish a uniform national system. (Sen. Rep. No. 94-1476, 2d Sess., pp. 129-131 (1976); *Kleakas* v. *EMI Films, Inc.* (1984) 150 Cal.App.3d 1102, 1109 [198 Cal.Rptr. 296].) Under the 1976 act, a copyright exists as the creation of a work and no formalities are required to acquire a copyright. (17 U.S.C. § 302 (a).) Failure to observe certain formalities or to register and deposit the work with the copyright office prior to suit leads to a loss of the copyright or the loss of certain remedies and attorneys' fees. (2 Nimmer on Copyright (1983) § 7.01, p. 7-7.)

Section 301 of the 1976 act preempts the rights created by state common law copyright if (1) those rights are equivalent to those protected by federal copyright law and (2) the subject matter of the copyright falls under the act.[4] ■ Although the United States Supreme Court has not determined

---

[2]Code of Civil Procedure section 631.8, subdivision (a) provides in part: "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, . . ."

[3]Jacobs argues in his reply brief that his fourth cause of action is not one for common law copyright infringement. His complaint, however, is entitled "Complaint for . . . common law copyright," its allegations support a cause of action for common law copyright infringement, and he argued infringement in the trial court.

[4]17 United States Code section 301 provides in part: "On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

"(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

"(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium

the meaning of "equivalent rights," we note that 17 United States Code section 106 provides that a copyright owner enjoys the right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." (17 U.S.C. § 106(3).) This is the same right Jacobs seeks to vindicate by his suit. His cause of action, therefore, is preempted by federal law providing architectural plans fall under the 1976 act. (U.S. Const., art. VI, cl. 2.)

Although the act makes no explicit reference to architectural drawings, we note that it encompasses "pictorial, graphic, and sculptural works" which include ". . . technical drawings, diagrams, and models." (17 U.S.C. §§ 101, 102; cf. *Aitken, Hazen, Hoffman, etc.* v. *Empire Const. Co.* (D.Neb. 1982) 542 F.Supp. 252.) The legislative history of the act also states "[a]n architect's plans and drawings would, of course, be protected by copyright . . ." (Sen. Rep. No. 94-1476, 2d Sess., p. 55 (1976).) ■ Jacobs, then, by virtue of section 301 and the supremacy clause of the United States Constitution, is restricted to an action under federal copyright law. (U.S. Const., art. VI, cl. 2.)

Jacobs is required to invoke federal jurisdiction to prosecute such action because the federal courts possess exclusive jurisdiction in actions arising under the federal copyright act. (28 U.S.C. § 1338(a); *Zachary* v. *Western Publishing Co.* (1977) 75 Cal.App.3d 911, 915 [143 Cal.Rptr. 34].)[5]

■ Jacobs contended in the trial court that he "is trying to protect a work of art" by this lawsuit. California has codified the French law of droit moral (moral rights) in the California art preservation act. (Civ. Code, § 987.) Moral rights include the right to disclose the work, withdraw it from public view, disassociate one's name from the work and the right to have the integrity of the work respected.[6] (Petrovich, *Artists' Statutory*

---

of expression; or . . .

" . . . . . . . . . . . . . . . . . . . .

"(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106."

[5]28 United States Code section 1338(a) provides in part: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights. . . . Such jurisdiction shall be exclusive of the courts of the states in . . . copyright cases."

Pendent jurisdiction of Jacobs' action for breach of contract exists because the facts underlying that action also give rise to the copyright infringement action. (3 Nimmer, *supra*, § 12.01[B], p. 12-14.)

[6]An artist's right to the integrity of his work is exemplified by Buffet c. Fersing, Cour d'appel, Paris, 1962 Dalloz, *Jurisprudence* 570. Buffet painted the surfaces of a refrigerator, designating it one work of art. The refrigerator was sold at auction along with other refrigerators painted by other artists. Several months later, Buffet noticed an auction catalog offered a single "painting on metal" attributed to him. Upon discovering the refrigerator had been disassembled Buffet sued to enjoin the sale of the panel and prevailed. (Petrovich, *Artists' Statutory Droit Moral in California: A Critical Appraisal* (1981) 15 Loyola Law Rev. 29, 37, fn. 46.)

*Droit Moral in California: A Critical Appraisal* (1981) 15 Loyola Law Review 29, 32.) Subdivision (c)(1) of section 987 creates a cause of action in the artist against one who defaces or alters a work of fine art. Subdivision (d) of that section permits an author to renounce authorship. Both subdivisions would be germane to Jacobs' lawsuit if architectural plans were covered by section 987. We conclude they are not because "fine art" is defined as "an original painting, sculpture, or drawing, or an original work of art in glass, of recognized quality, but shall not include work prepared under contract for commercial use by its purchaser." (Civ. Code, § 987, subd. (b)(2).)

Although the French droit moral embraces architectural plans (*Artists' Statutory Droit Moral, supra,* at p. 44, fn. 74), Jacobs' plans were copies of tracings prepared in a commercial context and are expressly excluded by section 987. Even if the inspiration that produces an architect's plans may be ignited by the same creative spark that inspires poetry or music, we must follow section 987. Jacobs' contentions are best addressed to the Legislature or, if as Nimmer argues, the right to prevent alteration is preempted by the 1976 Copyright Act, to Congress. (2 Nimmer, *supra,* § 8.21[C], p. 8-261.)

■ Since Jacobs' plans are not "fine art," he is also barred from recovery under California's codification of droit de suite (art proceeds right), the California resale royalties act (Civ. Code, § 986).[7] This section requires a royalty of 5 percent of the sale amount on any resale of ". . . an original painting, sculpture, or drawing, or an original work of art in glass." (Civ. Code, § 986, subd. (c)(2).) In the absence of legislative expression to include architectural plans prepared in a commercial setting, we cannot find recovery for Jacobs here. (See 2 Nimmer, *supra,* § 8.22[B], pp. 8-272.4(2)–8-272.8 for argument that the resale royalties act is also preempted by the 1976 Copyright Act.)

---

[7]Price, *Government Policy and Economic Security for Artists: The Case of the Droit de Suite* (1968) 77 Yale Law Journal 1333, 1335 describes the policy of droit de suite: "The droit de suite evolved from a particular conception of art, the artist, and the way art is sold. At its core is a vision of the starving artist, with his genius unappreciated, using his last pennies to purchase canvas and pigments which he turns into a misunderstood masterpiece. The painting is sold for a pittance, probably to buy medicine for a tubercular wife. The purchaser is a canny investor who travels about artists' hovels trying to pick up bargains which he will later turn into large amounts of cash. Thirty years later the artist is still without funds and his children are in rags; meanwhile his paintings, now the subject of a Museum of Modern Art retrospective and a Harry Abrams parlor-table book, fetch small fortunes at Park-Bernet and Christie's. The rhetoric of the *droit de suite* is built on this peculiar understanding of the artist and the art market. It is the product of a lovely wistfulness for the nineteenth century with the pure artist starving in his garret, unappreciated by a philistine audience and doomed to poverty because of the stupidity of the world at large. The *droit de suite* is *La Boheme* and *Lust for Life* reduced to statutory form."

■ There is substantial evidence to support the trial court's finding that defendants did not breach any contract with Jacobs. Plainly, the written contracts between the parties did not prohibit alteration of the plans or Westoaks' assignment of its license to use the plans on these two particular lots. Further, since Jacobs testified that he objected to the transfer of the plans with the sale of a different lot on a prior occasion, he was alerted to the practice and could have expressly prohibited the transfer in the contracts he drafted. The caveat on Jacobs' plans, delivered to Westoaks after it had already performed under the contract, could not have modified the written contract between the parties.

Moreover, California law evidences a policy in favor of the free transferability of all types of property. (Civ. Code, §§ 954, 1044, 1458.) In an analogous situation, our Supreme Court decided that contract rights under a patent license agreement were freely transferable in the absence of an express provision in the contract against assignment. (*Farmland Irrigation Co.* v. *Dopplmaier* (1957) 48 Cal.2d 208, 222 [308 P.2d 732, 66 A.L.R.2d 590].) In *Dopplmaier, supra,* a patent licensee assigned its right to manufacture and sell irrigation equipment to another corporation. The court upheld the assignment noting: "There is no reason to exempt these contracts from a general rule adapted to facilitate the freest possible transfer of valuable contract rights, while at the same time respecting the parties' intentions." (*Farmland Irrigation Co.* v. *Dopplmaier, supra,* 48 Cal.2d 208, 222.)

■ There is reason to uphold the trial court's finding concerning Jacobs' failure to prove civil conspiracy. There is no separate tort of civil conspiracy. The significance of the allegation is to hold each member of the conspiracy liable as a joint tortfeasor. (*Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168, 175-176 [79 Cal.Rptr. 543].) This joint liability does not accrue unless a wrongful act is carried out and damage results. (*Wetherton, supra,* 275 Cal.App.2d 168, 175-176.) There was no proof of a wrongful act by defendants or damage to Jacobs in this case.

Accordingly, the judgment is affirmed.

Stone, P. J., and Abbe, J., concurred.