[No. B013576. Second Dist., Div. Two. June 19, 1986.]

WILDA ROKOS, Plaintiff and Appellant, v.
MICHAEL I. PECK et al., Defendants and Respondents.

**COUNSEL**

Richard I. Wideman for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, James F. Lynch, Timothy R. Graves, Dummit & Agajanian, R. Mac Prout and David A. Heck for Defendants and Respondents.

**OPINION**

**COMPTON, J.**—Plaintiffs Kathy Bucuzzo and Wilda Rokos instituted this action against defendants American Broadcasting Company (ABC), Harold Sitowitz, Dr. Michael Peck, and the Suicide Prevention Center (Center) et al. to recover damages allegedly arising out of the unauthorized use of Bucuzzo's unpublished literary works dealing with the problem of teenage

suicide. The complaint, stating causes of action for plagiarism, breach of an implied-in-fact contract, and unjust enrichment, generally averred that Bucuzzo's writings served as the basis for an ABC television production also dealing with the subject of teenage suicide.

Prior to trial, ABC, Sitowitz, the writer of the allegedly infringing work, and several other defendants settled with both plaintiffs for $12,000, and the matter proceeded solely against Peck and the Center. During pretrial proceedings, the court entered a summary judgment as to the cause of action for plagiarism and a judgment on the pleadings as to the claim for unjust enrichment.

At trial, following plaintiffs' opening statement to the jury, defendants moved for judgment of nonsuit on the remaining contract cause of action as against Rokos. After considerable argument by the parties, the court granted the motion and this appeal followed.[1] We affirm.

The facts, derived from plaintiffs' opening statement and the pleadings, may be summarized as follows.

Sometime in 1976, Bucuzzo, then an 18-year-old aspiring film writer living in New England, drafted a semiautobiographical 2-part script concerning teenage suicide entitled "A Kind of Limbo" and "Aftermath." The story generally focused on the life of a disturbed high school adolescent, her relationships with family and friends, an attempt at suicide and the regaining of the will to live.

Following completion of the scripts, Bucuzzo sought support for their production by writing to the Suicide Prevention Center in Los Angeles. Her first letter, dated July 8, 1977, outlined the theme of the scripts and stated in part: ". . . [H]opefully, 'A Kind of Limbo' and 'Aftermath' will soon be made into a much-needed film project. If so, I would really appreciate the Center's endorsement of my project. Thanks for listening. [¶] Sunshine & Happiness, Kathy Bucuzzo. [¶] P.S. If the film is ever made, any financial profits which I may personally receive will be donated by me to your Center for appropriate use."

---

[1]Bucuzzo proceeded to trial on her claim for breach of an implied-in-fact contract and judgment was rendered in her favor. The jury awarded damages of $39,000 against Peck and $1,000 against the Center and another defendant, the Institute for Studies of Destructive Behavior. Pursuant to defendants' motion for judgment notwithstanding the verdict, the trial court reduced the damage award against Peck by $11,300, and against the remaining defendants by $300. Bucuzzo's appeal from the judgment, concerning issues unrelated to this case, is still pending (B007276). Rokos (sometimes referred to as plaintiff), therefore, is the only appellant now before this court.

The Center directed the correspondence to one of its staff psychologists, Dr. Michael Peck, who had frequently consulted with writers, directors, and producers on film projects concerning suicide. He replied by letter dated July 19, 1977: "Dear Ms. Bucuzzo: I received your letter today, and was quite interested and intrigued by your ideas. [¶] . . . I have been doing work in adolescent suicide for many years and also have made a number of films. [¶] . . . Your story idea sounds attractive to me, but since I am not in television directly I would like your permission to show your scripts to some local film/TV producer friends of mine. If you have a script treatment and you are willing to send me copies, I would attempt to see that they are read by some people who might be able to be of help to you. [¶] Please let me know your feelings about this. [¶] Sincerely yours, Michael L. Peck, Ph.D.[,] Director, Youth Services."

Surprised and excited by such a rapid response to her correspondence, Bucuzzo quickly assented to Peck's request. Her letter, dated July 23, 1977, promising to forward two copies of the script treatments, concluded in pertinent part: "*You have my permission to show my material to any of your film/T.V. producer friends who may be interested in the project.*" (Italics added.)

Some three months later, Bucuzzo again wrote to Peck, this time requesting to know if his efforts had met with any success. Peck replied on October 27, 1977, returning the scripts and stating that he had been unable to generate any interest in the film industry for her project.

Undaunted by this setback, Bucuzzo continued in her attempt to find someone who would finance and/or produce her work. Finally, in April 1978, Bucuzzo engaged Wilda Rokos, an independent producer and former employee of Creative Management Associates, to promote and/or hopefully produce the scripts.[2] Rokos contacted ABC, among others, in an attempt to generate interest in the story, but was informed that the network was in the process of producing its own film dealing with teenage suicide.

In January 1979, ABC televised a "Movie of the Week" written by Harold Sitowitz and entitled "Last Cry for Help." The film, concerning a high school girl's attempt at suicide, listed Peck and the Center, among others, as technical consultants.

We first address plaintiff's argument that the trial court erred in granting defendants' motion for nonsuit after her counsel.had completed his opening statements to the jury.

---

[2]Sometime in January 1979, Bucuzzo and Rokos memorialized in writing the nature of their agreement. Although this document was examined by the trial court during the motion for nonsuit, it has not been made a part of the record on appeal.

After asserting most of what he expected to prove in his case-in-chief, counsel attempted to explain to the jury how Peck had breached his implied-in-fact contract with Rokos. We quote in pertinent part: "Now, I talked to you about implied-in-fact contract as the legal theory we are proceeding under. The court is going to explain what an implied-in-fact contract is to you when it gives you instructions. I am not going to even attempt to do that here. But there are some facts that will be helpful to you in discussing or deciding whether it was breached. [¶] First, Peck admits—that he has no right to sell the script, no right to use it. Second, Peck asked Bucuzzo to send her scripts to him, and he offered to show it to people to help her— help her. Third, the Suicide Prevention Center received $1,000 and Peck got screen credit for acting as consultant. [¶] Now, the evidence will show that it was normal in the relationship between Peck and the Suicide Prevention Center that when he worked on a project to their knowledge through the Center, that the $1,000 or the money, whatever it is, went to the Center, not to him personally. [¶] With respect to screen credit—in fact Sitowitz will tell you that Peck asked for some screen credit different from the credit he actually received. Sitowitz didn't recall what the credit was, but he remembers telling Peck that he didn't think Peck would be allowed to get it. You will have to decide what Peck was thinking about."

Counsel then continued with his opening statement as follows: "Meanwhile, after Peck returns the scripts to Bucuzzo in October of '77, Bucuzzo does not stop her efforts to sell the scripts. In April of 1978, she engages Wilda Rokos, the other plaintiff, to act as her producer to produce her teenage suicide script, to try to get this project made into some sort of movie, either theatrical or television, and Wilda Rokos sets out to do that. [¶] Now, she is an experienced person in the entertainment business. She's been with Creative Management Associates which was a large talent agency. She's been an independent television producer, but she has never had a network production. [¶] Now, Wilda Rokos contacts ABC, but nothing results from that because ABC already has a project under development. Rokos has not been able to get Bucuzzo's script produced to this date. *And it is her claim that Bucuzzo's script has already been produced in substantial part as the ABC television movie of the week 'Last Cry for Help.'* [¶] *And it is her further claim that these defendants, who either sold or gave away Bucuzzo's scripts in breach of their implied contract, are liable for her damages in not being able to get it produced as well.* [¶] You will hear expert testimony from William Immerman who is a long time entertainment industry executive, would be one of the former heads of 20th Century Fox, which of course encompasses almost everybody in the movie business. And he will tell you about the value of a first credit, a first network credit for a writer and for a producer." (Italics added.)

Defendants' motion for a judgment of nonsuit was based on the ground that plaintiff's counsel "had conceded that there had been no assignment by Bucuzzo to Rokos of any right Bucuzzo had in the alleged contract between Bucuzzo and defendants, therefore Rokos had no standing to sue for breach of contract." After giving plaintiff's attorney an opportunity to augment his statement to the jury in response to the issues raised by the motion, the trial court granted the nonsuit solely against Rokos.

■ "A nonsuit may be granted only when, '". . . disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.'" [Citation.]" (*Downer* v. *Bramet* (1984) 152 Cal.App.3d 837, 842 [199 Cal.Rptr. 830]; see Code Civ. Proc., § 581c.[3]) ■ Also, since the motion for nonsuit is designed to call attention to correctable defects, granting such a motion after the plaintiff's opening statement can be upheld only where it is clear that counsel has stated all the facts. (*John Norton Farms, Inc.* v. *Todagco* (1981) 124 Cal.App.3d 149, 161 [177 Cal.Rptr. 215].) The record in the case at bench indicates that plaintiff's counsel was given every opportunity to state all of the facts he hoped to prove to establish his case against each defendant.[4]

The issue to be decided is whether, in the context of the present law governing copyright and the protection of literary and artistic works, the relationship between Bucuzzo and Rokos resulted in the latter acquiring any right which could be pursued under *state* law.[5]

At the outset of our discussion, we think it important to stress that Bucuzzo did *not* purport to assign her cause of action for breach of an implied-in-

---

[3]Code of Civil Procedure section 581c states in relevant part: "(a) After the plaintiff has completed his or her opening statement, or the presentation of his or her evidence in a trial by jury, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit. . . . (c) If the motion is granted, unless the court in its order for judgment otherwise specifies, the judgment of nonsuit operates as an adjudication upon the merits. . . ."

[4]The reporter's transcript of the proceedings makes it clear that after the motion for nonsuit was argued by the parties, and the court indicated it was about to rule on the motion, plaintiff's attorney never asked for an opportunity to modify or add to his opening statement. Counsel expressly stated, in response to the court's inquiry, "I have nothing to augment because what I told you is both the facts, and I am not going to say something that I can't prove, and also because it states a cause of action."

[5]As we will discuss, *infra*, federal copyright law has preempted the field and eliminated the ability of the states to provide common law *copyright* protection against infringements occurring after the effective date of the federal statute.

fact contract to Rokos. At the time she contracted with Rokos, Bucuzzo was obviously unaware that she had any right against defendants.

Although, as we have noted, the exact terms of the agreement between Bucuzzo and Rokos are not before us, we can assume, as a basis for our analysis, that Bucuzzo assigned to Rokos the right to produce for profit and other consideration, a movie based on the script written by Bucuzzo. We will also assume, as Rokos contends, that these "production rights" did *not* constitute the sum total of Bucuzzo's interest in the script.

In summary then, Rokos's position is simply that Bucuzzo had the ability to assign to different individuals various segments of her "property" rights in the script, and that each of the assignees would have the right to share in the claim for breach of an implied-in-fact contract executed prior to those "subassignments," even though neither assignor nor assignee were aware that the cause of action existed at the time of the assignment.

As we will discuss, *infra,* our opinion is that the nature of the device of an implied-in-fact contract as applied in the context of literary or artistic property law and the nature of the protection its application is designed to afford, militate against plaintiff's position. To accept the argument advanced here would be tantamount to affording state *copyright protection* coextensive with that afforded by federal law.

The parties have referred us to no controlling authority and our independent research has revealed none. We therefore begin our analysis by considering the nature of implied-in-fact contracts in the field of literary and artistic property rights and the evolution of the state and federal law.

In general, redress for plagiarism rests upon a showing that defendant produced a literary work substantially similar to a *protectible* work of the plaintiff. It is this requirement of a "protectible expression" which is at the heart of most controversies.

"An action for plagiarism may prevail only if similarities exist with respect to 'protectible expression.' Ideas, titles, themes, locales, and even the basic plot do not constitute protectible material. [Citation.] Whether or not a protectible interest exists 'depends upon the originality of form and manner of expression, the development of characterizations and sequence of events.'" (*Klekas* v. *EMI Films, Inc.* (1984) 150 Cal.App.3d 1102, at p. 1111, fn. 5 [198 Cal.Rptr. 296].)

Abstract ideas, however, are not now entitled to protection in an action for plagiarism under either federal or state law. (See also 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 35, p. 1647.)

As Professor Nimmer has noted, the federal copyright statutes do not protect ideas, but rather only the *expression* of ideas. "The concept that ideas are 'free as air' is of ancient origin, and is well rooted in our jurisprudence." (3 Nimmer on Copyright (1985) § 16.01, p. 16-2; fn. omitted.) "Copyright does not preclude others from using the ideas or information revealed by the author's work. It pertains to the literary, musical, graphic, or artistic form in which the author expressed intellectual concepts. Section 102(b) [of the federal Copyright Act of 1976] makes clear that copyright protection does not extend to any idea, procedure, process system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." (H.R.Rep. No. 94-1476, 94th Cong., 2d Sess., 56-57 (1976).)

Prior to 1947, however, California Civil Code section 980 provided: "The author of *any product of the mind,* whether it is an invention or a composition in letters or art, a design, with or without delineation, or other graphical representation, has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the product and the representations or expressions thereof made by him remain in his possession." (Italics added.) Both the Supreme Court and Courts of Appeal interpreted this statute as affording protection to the "idea" itself, the "product of the mind," as well as "the representation or expressions thereof." (See *Golding* v. *R.K.O. Pictures, Inc.* (1950) 35 Cal.2d 690 [221 P.2d 95]; *Stanley* v. *Columbia Broadcasting System* (1950) 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216].)

In 1947, the Legislature amended section 980 and in so doing eliminated the protection given to "any product of the mind." As noted by our Supreme Court in the landmark case of *Weitzenkorn* v. *Lesser* (1953) 40 Cal.2d 778, 789 [256 P.2d 947], the amendment "abrogated the rule of protectibility of an idea and California now accepts the traditional theory of protectible property under common law copyright. [Citation.]"

Soon after the 1947 amendment to the Civil Code, one commentator observed: "In many courts it is now being argued by literary artists that they must have some form of protection for their ideas. They argue that in motion picture story writing and television program writing, it has become necessary to submit ideas to the show producers, and not develop them into complete works until and unless they are approved. [¶] Recognizing the problem faced by many writers, the courts are trying to work out a protection that does not run afoul of the historical concept that there is no property right in an idea. This they are doing by enforcing express or implied in fact contracts for the use of the ideas. 'If it [the ideas] cannot be sold or negotiated or used without a disclosure, it would seem proper that some contract should

guard or regulate the disclosure.'" (See Comment (1953) 26 So.Cal.L.Rev. 459-461.)

By the early 1950's, the principle that "ideas" could be protected by contract became firmly embedded in the laws of this state. In *Desny* v. *Wilder* (1956) 46 Cal.2d 715, 733 [299 P.2d 257], the Supreme Court acknowledged that Justice Traynor's dissenting opinion in *Stanley* v. *Columbia Broadcasting System, supra,* 35 Cal.2d 653, accurately summarized the principles affording protection to those who originate ideas as opposed to those who receive benefits under federal and common law copyright statutes. ▆▆▆ In *Stanley,* Justice Traynor stated in pertinent part: "The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay. [Citations.] ▆▆▆ Unlike a copyright, a contract creates no monopoly; *it is effective only between the contracting parties; it does not withdraw the idea from general circulation. Any person not a party to the contract is free to use the idea without restriction.* [¶] ▆▆ Even though the idea disclosed may be 'widely known and generally understood' [citations], it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty. [Citations.] ▆▆ An implied-in-fact contract differs from an express contract only in that the promise is not expressed in language but implied from the promisor's conduct." (*Stanley* v. *Columbia Broadcasting System, supra,* 35 Cal.2d 653, 674, italics added; see also *Chandler* v. *Roach* (1957) 156 Cal.App.2d 435 [319 P.2d 776].)

▆▆ Thus in California the device of the implied-in-fact contract is employed to protect the ideas of literary artists who, in the course of attempting to market their ideas, must necessarily disclose them to producers and publishers. That remedial device does not, however, invest an abstract idea with the attributes of property (Civ. Code, § 654) and the attendant divisible assignability of those rights which constitute property ownership.

The federal Copyright Act of 1976 contains "the first explicit statutory recognition of the principle of divisibility of copyright in our law." (H.R.Rep. No. 94-1476 at p. 123.) Repudiation of the concept of indivisibility rooted in prior law was long an important objective of authors and other groups. (See Kaminstein, Divisibility of Copyright, 1 Studies on Copyright 623 (Arthur Fisher Mem. Ed. 1963).) In historical perspective, since the Copyright Act of 1909 spoke of a single copyright to which the author of a work was entitled, and referred in the singular to "the copyright proprietor," it was inferred that the "bundle of rights" which accrued to a

copyright owner were "indivisible," that is, incapable of assignment in parts. "This notion, which found its historical roots in an early English copyright case and an American patent case when literally followed render[ed] it impossible to 'assign' anything less than the totality of rights commanded by copyright. A transfer of anything less than such a totality was said to be a 'license' rather than an assignment. *The purpose of such indivisibility was to protect alleged infringers from the harassment of successive law suits.* This result was achieved since only the copyright proprietor (which would include an assignee but not a licensee) [has] standing to bring an infringement action. However, the necessity for such a procedural safeguard was rendered largely nugatory by later adopted rules whereby an exclusive licensee might bring an infringement action subject to the requirement of joining the copyright proprietor as a party plaintiff or defendant." (3 Nimmer on Copyright (1985) § 10.01[A], pp. 10-4–10-5; fns. omitted: italics added.)

In any event, the 1976 act expressly contemplates a divisible copyright by providing: " 'Copyright owner,' with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." (17 U.S.C. § 101.) This definition underlies section 201(d)(2) which states that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106 [the provision enumerating protected rights], may be transferred . . . and owned separately." In line with the definition quoted immediately above, this subsection then provides that "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title."[6]

This lengthy review of the federal copyright statutes serves to emphasize that it is those laws that afford protection to owners of literary and artistic property rights who seek to assign or otherwise divide those rights.

---

[6]The importance of the changes in law brought about by the 1976 act have been noted by Professor Nimmer: "When the doctrine of indivisibility was first enunciated the only effective manner in which copyrighted materials could be exploited was through the reproduction of copies. Hence no great hardship resulted from the doctrine which limited assignments to transfers of all rights under the copyright since there was little incentive to reserve rights other than the reproduction right. The subsequently developed media of communications completely altered this situation. Today the value of motion picture rights in a novel will often far exceed the value of the right to publish the work in book form. Moneys derived from performing and recording popular songs are greatly in excess of the value of 'copying' such songs in sheet music form. In short, the development of motion pictures, television, phonograph records, and legitimate stage productions as well as the emergence of the performing rights societies have meant that as a matter of commercial reality 'copyright' is now a label for a collection of diverse property rights each of which is separately marketable." (3 Nimmer on Copyright (1985) § 10.01[A], pp. 10-5–10-6; fns. omitted.)

Here we do not deal with "protectible interests" subject to copyright protection, but rather abstract ideas that neither the laws of this nation nor this state have given statutory recognition.

The evolution of the law in this complex field makes it clear that in the context of this case the ability to assign the rights inhering in an implied-in-fact contract differs significantly from the ability to assign the rights in a protected literary or artistic property.

■ Certainly a full-blown and known cause of action, including an action for breach of an implied-in-fact contract, can be assigned. That is not the same as saying that the purported assignment of various interests in a noncopyrighted literary work gives the assignees the right to pursue a cause of action for breach of an implied-in-fact contract for the sale of an idea which may have previously arisen as the result of negotiations between the creator and some third party. (7 Cal.Jur.3d, Assignments, § 15, pp. 28-29.)

■ As previously noted, copyright protection extends to the "expression" of an idea, not to the idea itself. "It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea. [Citations.] This principle attempts to reconcile two competing social interests: rewarding an individual's creativity and effort while at the same time permitting the nation to enjoy the benefits and progress from use of the same subject matter." (*Sid & Marty Krofft Television* v. *McDonald's Corp.* (9th Cir. 1977) 562 F.2d 1157, 1163.)

In California, partially or wholly because of the importance and value of the entertainment industry to this state, "idea men" have been able to protect their interests, financial or otherwise, in their literary ideas by the legal "fiction" of the implied-in-fact contract. ■ We are of the belief, however, that an "idea," in and of itself, unlike literary or other property entitled to copyright protection, may not be segmented into varying rights that may each be independently assigned.

Moreover, our decision is supported by practical considerations. "A fundamental objective of copyright law is to foster creativity." (*Pendleton* v. *Acuff-Rose Publications, Inc.* (M.D.Tenn. 1984) 605 F.Supp. 477, 484.) To meet that goal, Congress has established a comprehensive statutory scheme to promote the orderly exploitation of copyrighted works. For example, section 201.4 of the Copyright Office's Rules and Regulations provides in part that "Any transfer of copyright ownership (including any instrument of conveyance, or note or memorandum of the transfer), or any other document pertaining to a copyright, may be recorded in the Copyright Office. . . ." (37 C.F.R. § 201.4 (1986).) Section 205, subdivision (b) of

the Copyright Act commands that "The Register of Copyrights shall, upon receipt of a document . . . record the document and return it with a certificate of recordation." Subdivision (d) provides: "No person claiming by virtue of a transfer to be the owner of a copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this title until the instrument of transfer under which such person claims has been recorded in the Copyright Office. . . ." Another subdivision pertains to priority between conflicting transfers. (See § 205, subd. (f) of the Copyright Act of 1976.)

Needless to say, California law does not provide a statutory scheme for the recordation of the transfers of ideas or parts thereof. For us to adopt Rokos's divisibility argument would thus place producers or others to whom ideas are "pitched" in jeopardy of unforeseen or uncontemplated liability. The instant case is a graphic example of that proposition.

██ Although we recognize that assignability of things in action is now the rule and nonassignability the exception, contracts of a purely personal nature generally fall under the exception. (See *Osuna* v. *Albertson* (1982) 134 Cal.App.3d 71, 81-82 [184 Cal.Rptr. 338].) As we see it, the creation of an implied-in-fact contract between an author, on the one hand, and an agent, producer, or director, on the other hand, is of such a personal nature that *it is effective only between the contracting parties.* (See *Chandler* v. *Roach, supra,* 156 Cal.App.2d 435, 441.)

In each of the cases involving breach of an implied-in-fact contract which we have reviewed, the plaintiffs were either unknown authors or established writers who had conveyed their stories, scripts, or ideas to persons seeking to sell and/or produce the work.

██ As stated by the court in *Chandler* v. *Roach, supra,* at pages 440-441: ". . . [T]he assent of the writer is found in his submission of the idea or material to the producer, with the reasonable expectation of payment which can be inferred from the facts and circumstances. The assent of the producer is manifested by his acceptance of the idea or material submitted under the circumstances, a part of which is that it is reasonably understood that [an] . . . author expects payment of the reasonable value of the idea or the material, if used, so that the conduct of the producer in accepting it implies a promise to fulfill those reasonable expectations." (*Id.,* at pp. 440-441.)

██ The rights flowing from such an agreement are qualitatively different from copyright protection, and their recognition creates no monopoly in the ideas involved. A cause of action for breach of an implied-in-fact contract

bears upon the relationship between the individual parties and makes breaches of such agreements actionable between parties because of the nature of their *personal relationship*.

█ For reasons similar to those discussed *ante,* we further hold that the trial court properly granted defendants' motion for judgment on the pleadings in relation to the claim for unjust enrichment.[7]

Plaintiff concedes in her opening brief, as she did at the trial court level, that this count actually attempts, inartfully, to plead a cause of action for breach of confidence. This concession finds ample support in and is compelled by case law. (*Davies* v. *Krasna* (1975) 14 Cal.3d 502 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; *Faris* v. *Enberg* (1979) 97 Cal.App.3d 309, 321-325 [158 Cal.Rptr. 704]; *Fink* v. *Goodson-Todman Enterprises, Ltd.* (1970) 9 Cal.App.3d 996, 1009-1010 [88 Cal.Rptr. 679]; also see 3 Nimmer on Copyright (1985) 16.06 pp. 16-45–16-49.)

In *Davies* v. *Krasna, supra,* 14 Cal.3d 502, Justice Tobriner observed that the theory of liability for breach of confidence had never been specifically recognized nor rejected by that court. While his language raises considerable doubt as to whether such a cause of action should be countenanced, several court of appeal opinions have recognized such a cause of action. (*Tele-Count Engineers, Inc.* v. *Pacific Tel. & Tel. Co.* (1985) 168 Cal.App.3d 455 [214 Cal.Rptr. 276]; *Faris* v. *Enberg, supra,* 97 Cal.App.3d 309; *Fink* v. *Goodson-Todman Enterprises, Ltd., supra,* 9 Cal.App.3d 996.)

We must respectfully point out that our colleagues have not been too precise in describing the nature of the cause of action. It is said to be based on ". . . an implied obligation or contract between the parties" (*Tele-Count Engineers, Inc.* v. *Pacific Tel. & Tel. Co., supra,* at p. 464); ". . . an obligation created by law for reasons of justice" (*Fink* v. *Goodson-Todman Enterprises, Ltd., supra,* at p. 1010); or a "tort." (*Thompson* v. *California Brewing Co.* (1961) 191 Cal.App.2d 506 [12 Cal.Rptr. 783]; also see Nimmer on Copyright, *supra,* § 16.06 at p. 16-48.)

Regardless of the nature of the cause of action for breach of confidence, insofar as this case is concerned, such a cause of action gains plaintiff

---

[7]After incorporating by reference the other allegations contained in the complaint, the count of unjust enrichment states: "Defendants, and each of them, have been unjustly enriched by reason of their use of . . . [Bucuzzo's] script and story 'A Kind of Limbo' in an amount not now known to plaintiffs, but which sum plaintiffs are informed and believe, and thereon allege, is in excess of $500,000.00. [¶] On account of their unjust enrichment, defendants and each of them should be required to account for all their profits from 'Last Cry for Help' and to pay the same over to plaintiffs."

nothing. The statute of limitations for either cause of action for breach of implied contracts or cause of action for breach of confidence is identical (*Davies* v. *Krasna, supra,* 14 Cal.3d 502) and there is no statute of limitations issue presented. The measure of damages would be the same and no non-monetary relief is involved.

Most significantly, however, is the fact that even if we viewed the situation here as a breach of confidence, the assignability issue remains the same as previously discussed.

■ As in a claim for breach of an implied-in-fact contract, the cause of action for breach of confidence focuses on the nature of the personal relationship existing between the original parties to the agreement, one of whom obligates him or herself not to disclose the ideas revealed in confidence. In the case at bench, Rokos had no contact with Peck or the Center and thus could not assert a claim that defendants had somehow breached their obligation to her regardless of the purported assignment of production rights in Bucuzzo's idea. Viewing the allegations of the complaint in their totality, as we must, we can only hold that plaintiff's pleadings fail to establish a breach of confidence entitling her to damages for unjust enrichment.[8]

We turn next to plaintiff's contention that the trial court erred in granting summary judgment in favor of defendants by ruling that the cause of action for common law copyright infringement had been preempted by federal statute.

■ The rules governing adjudication of a motion for summary judgment are well known. On appeal all reasonable inferences are drawn in favor of the party opposing the motion. Neither the trial court nor the appellate court on review from a summary judgment may weigh the evidence. Our function ends when we determine that there is or is not a triable issue. In reaching this conclusion we express no opinion on the merits of the case, nor do we pass on the truth or falsity of the facts which have been pleaded. (*Cohan* v. *Alvord* (1984) 162 Cal.App.3d 176, 180 [208 Cal.Rptr. 421]; *Freidberg* v. *Freidberg* (1970) 9 Cal.App.3d 754, 761, 763 [88 Cal.Rptr. 451].) "Where no triable issues of fact are presented, and the sole remaining question is one of law, it may appropriately be determined on a motion for summary judgment [citations]." (*Leo F. Piazza Paving Co.* v. *Foundation*

---

[8]Since Bucuzzo is not a party to this appeal we need not discuss defendants' contention that there was no breach of confidence as a matter of law because the pleadings admit that Bucuzzo explicitly gave Peck permission to show her screenplay "to television producers with the hope of selling the story and script."

*Constructors, Inc.* (1981) 128 Cal.App.3d 583, 589 [177 Cal.Rptr. 268].)

 Here, it is undisputed that Sitowitz, who was apparently commissioned to write "Last Cry for Help" in the latter months of 1977, did not meet and consult with Peck until February 1978. Rokos claims, however, that the alleged infringement of Bucuzzo's work began in July 1977, when Peck received the script treatments. We disagree.

Our holding in the recent case of *Klekas* v. *EMI Films, Inc., supra,* 150 Cal.App.3d 1102, is determinative of the preemption issue. There, the plaintiff alleged that his unpublished literary work, entitled "The Fields of Discontent" and written in 1970, had, without authorization, been used as the basis for the screenplay, motion picture, and later novelization of "The Deer Hunter." That work had been conceived and written by the defendant authors in 1976. The motion picture was filmed in 1977, distributed in December 1978, and generally released in February 1979. The plaintiff filed suit in 1980, alleging causes of action for, inter alia, plagiarism, quasi-contract, implied-in-fact contract, and the imposition of a constructive trust. The defendants moved for summary judgment and the trial court sustained the motion, finding that the plagiarism claim had, in part, been preempted by the Copyright Act of 1976.

On appeal, we affirmed the court's ruling and concluded that the act preempted common law causes of action based upon an unauthorized use occurring after January 1, 1978, regardless of when the plaintiff's original work was created.

Section 301, subdivision (a) of the act provides: "On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, *whether created before or after that date and whether published or unpublished* are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." Enactment of this new law, however, did not affect any rights a plaintiff may have had based on a theory of common law copyright if the cause of action arose "from *undertakings commenced* before January 1, 1978." (17 U.S.C. § 301(b)(2); . . .) (Italics in the original.)

Based upon an extensive review of the statute, its legislative history and federal case authority, we held that the date when the plaintiff created or

began creation of the work which was allegedly subsequently plagiarized by the defendant is of no legal significance. What is dispositive, however, was the date the alleged plagiarism occurred. (*Id.*, at pp. 1109-1110.)

Applying the foregoing principles to the facts of the instant case, the trial court found that to the extent that plaintiff had any action for infringement with respect to the screenplay of "Last Cry for Help" it arose after January 1978, when Peck and the Center consulted with Sitowitz about the making of the film. The fact that Peck first acquired access to Bucuzzo's script during the summer of 1977 is legally irrelevant to plaintiff's cause of action for common law plagiarism. Whether or not defendants breached the alleged implied-in-fact contract with either Bucuzzo or Rokos prior to 1978 is also of no consequence since such a breach does *not* give rise to a claim for copyright infringement. (See *Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, 791; *Klekas* v. *EMI Films, Inc., supra,* at p. 1114; *Mann* v. *Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 634 [180 Cal.Rptr. 522].) What is relevant, then, is the date when defendants allegedly began, in whatever manner, to copy Bucuzzo's work. Although Sitowitz may have been commissioned to write a screenplay in 1977, there is no indication in the record now before us that he had any form of access, either through Peck or any other defendant, prior to January 1, 1978. It seems obvious to us that without such access he could not have plagiarized Bucuzzo's script. The trial court thus properly determined that it had no subject matter jurisdiction to adjudicate plaintiff's cause of action for common law copyright infringement.

Having concluded that the trial court correctly granted defendants' motions for judgment of nonsuit, judgment on the pleadings, and summary judgment, we need not discuss plaintiff's remaining contentions.

The judgments are affirmed.

Roth, P. J., and Beach, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 25, 1986.