**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FILIA KOURTIS; CON KOURTIS,
           *Plaintiffs-Appellants,*

                 v.

JAMES CAMERON; INTERNATIONAL
CREATIVE MANAGEMENT; MARIO P.
KASSAR; JEFFREY BERG; JOSEPH
ROSENBERG,

           *Defendants-Appellees.*

No. 03-56703

D.C. No.
CV-02-02906-WMB

OPINION

Appeal from the United States District Court
for the Central District of California
William Matthew Byrne, Senior District Judge, Presiding

Argued and Submitted
May 4, 2005—Pasadena, California

Submission Withdrawn May 9, 2005
Resubmitted August 8, 2005

Filed August 15, 2005

Before: Diarmuid F. O'Scannlain and
Kim McLane Wardlaw, Circuit Judges, and
Charles C. Lovell,* District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Charles C. Lovell, Senior United States District Judge
for the District of Montana, sitting by designation.

10573

**COUNSEL**

Patricia J. Barry, Los Angeles, California, argued the cause for the appellants and filed the briefs.

Marisa G. Westervelt, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP, Los Angeles, California, and Charles N. Shephard, Greenberg, Glusker, Fields, Claman, Machtinger & Kinsella LLP, Los Angeles, California, argued the cause for the appellees; Louis R. Miller, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP, Los Angeles, California, and Howard L. Horwitz, Oberstein, Kibre & Horwitz, LLP, Los Angeles, California, were on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the creators of the yet-unproduced film *The Minotaur* are collaterally estopped from pursuing a copyright infringement claim against the producers of *Terminator II*.

I

In 1987, Filia and Constantinos Kourtis developed the concept for a film entitled *The Minotaur*, which details the exploits of a half-man, half-bull that can transform itself into various human and inanimate forms. The Kourtises set forth their ideas in a thirty-page "treatment" that provides a synopsis of the prospective film. They registered this material with the Worldwide Register of Copyrights and then hired William Green to write a screenplay based upon their treatment. The agreement between Green and the Kourtises provided that the Kourtises would own the screenplay's rights.

In 1989, the Kourtises began to shop the screenplay around to various Hollywood production companies. Jeffrey Berg, an employee of International Creative Management ("ICM"), received a copy, and he informed the Kourtises that he would share the materials with film maker James Cameron, who was an ICM client. Cameron contacted the Kourtises and initially expressed an interest in *The Minotaur*, but ultimately neither Cameron nor anyone else agreed to produce the project.

In 1991, Cameron released the film *Terminator II: Judgment Day*, which—like *The Minotaur*—features a character that can transform its appearance into both human and nonhuman forms. Green responded by filing a copyright infringement action in the United States District Court for the Central District of California against Cameron and other persons associated with *Terminator II*. *Green v. Schwarzenegger*, No. CV

93-5893 (WMB) (C.D. Cal. filed Sept. 29, 1993). Green alleged that he—not the Kourtises—owned the copyright to the *Minotaur* screenplay and that Cameron had misappropriated *The Minotaur*'s concept of a shape-changing character.

Although Filia Kourtis was deposed by Cameron, the Kourtises did not intervene in Green's suit. The court ultimately found that *Terminator II* and *The Minotaur* are not substantially similar and granted summary judgment to Cameron and the other defendants on Green's copyright infringement claim. *Green v. Schwarzenegger*, No. CV 93-5893 (WMB) (C.D. Cal. July 1, 1994), at 8.

The Kourtises, who reside in Australia, then brought suit against Green in an Australian court to determine ownership of the *Minotaur* materials. After the Kourtises prevailed in that action, *see Kourtis v. Green*, No. 8497 (Vict. Mar. 19, 1998), they filed their own suit against Cameron[1] in the Central District of California, alleging copyright infringement, breach of implied contract, breach of oral contract, and breach of confidence. Like Green, the Kourtises alleged that Cameron had utilized *The Minotaur*'s shape-changing concept in *Terminator II* without providing payment or attribution.

The district court granted Cameron's motion to dismiss the Kourtises' complaint. The court concluded that the Kourtises are collaterally estopped by the *Green* decision from relitigating the copyright infringement issue. The court further held that the Kourtises' state law claims are barred by the statute of limitations. The Kourtises timely appealed.

---

[1]The Kourtises also named Berg and ICM as defendants, as well as Mario Kassar, one of *Terminator II*'s producers; Joseph Rosenberg, an ICM employee; and William Wisher, coauthor of *Terminator II*. Wisher is not a party to this appeal. The defendants are collectively referred to as "Cameron."

II.

The Kourtises argue that the *Green* litigation does not preclude their copyright infringement claim because Green's allegations differ from their own and because they were not a party to the earlier proceedings.[2]

A

**[1]** The doctrine of collateral estoppel (or issue preclusion) "prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding." *Shaw*, 56 F.3d at 1131. A federal court decision has preclusive effect where

> (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

[2]As a preliminary matter, the Kourtises assert that the district court converted Cameron's motion to dismiss into a summary judgment motion by considering extraneous materials and that the judgment should therefore be reversed because they were not afforded an opportunity for discovery. This contention is unavailing because the district court limited its analysis to materials properly within the purview of a motion to dismiss.

The district court's consideration of an unpublished court order from the *Green* litigation was appropriate because court records from related proceedings can be taken into account without converting a motion to dismiss into a summary judgment motion. *See Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995) ("In deciding whether to dismiss a claim under Fed. R. Civ. P. 12(b)(6), a court may look beyond the plaintiff's complaint to matters of public record."). The district court also properly considered a chart of alleged similarities between *The Minotaur* and *Terminator II* because that material was appended to the Kourtises' complaint. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("when ruling on a motion to dismiss, [a court] must disregard facts that are not alleged on the face of the complaint or contained in documents attached to the complaint").

*Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).

We address these elements in turn.

1

**[2]** There are several factors that guide our determination of whether an issue litigated in a prior case is identical to one raised in later proceedings. Relevant considerations include whether there is a substantial overlap between the evidence in the two cases and whether both suits involve application of the same rule of law. *See Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999).

Green's suit alleged that Cameron infringed upon *The Minotaur*'s copyright by incorporating a shape-changing character into *Terminator II*.[3] According to the district court's written decision in that case, Green "allege[d] that in August 1989, he submitted his screenplay 'The Minotaur' to Jeffrey Berg of ICM. ('Draft 1'). On January 31, 1990, Joe Rosenberg at ICM expressed interest and requested a second draft ('Draft 2'), which plaintiff provided. About two years later, ICM and other defendants released 'Terminator 2.' Thereafter, plaintiff brought this suit." *Green*, No. CV 93-5893 (WMB), at 1-2. Green argued that the "defendants have copied several unique aspects of his screenplays," including the Minotaur's ability to change shape. *Id.* at 6. After reviewing the screenplays, the *Green* court granted summary judgment to the defendants because no rational trier of fact could have

---

[3]We grant Cameron's Request for Judicial Notice and Supplemental Request for Judicial Notice of materials submitted in the *Green* litigation. *See Shaw*, 56 F.3d at 1129 n.1 (taking judicial notice of court records as part of a collateral estoppel inquiry). The Kourtises' Motion to Take Judicial Notice is denied as untimely because the Kourtises did not comply with our instruction that such materials be submitted within fifteen days of the date of the supplemental briefing order.

found substantial similarity between *The Minotaur* and *Terminator II. Id.* at 8.

**[3]** The sole basis for the Kourtises' copyright infringement claim is the allegation that Cameron misappropriated *The Minotaur*'s shape-changing concept for use in *Terminator II. See* Compl. ¶ 53 ("The Minotaur Project and Term. II are more similar than Terminator I ('Term. I') and Term. II are. There was no 'morphing' i.e., metamorphosis of bodies or parts of bodies into other objects in Term. I as there is in the Minotaur Project and Term. II."); *id.* ex. 1 (comparing shape-changing scenes from *Terminator II* and the *Minotaur* script). Notwithstanding the substantial overlap between their arguments and those advanced by Green, the Kourtises contend that collateral estoppel does not attach because their copyright claim is premised upon both the original *Minotaur* treatment and the screenplay, whereas Green relied exclusively upon the screenplay. The *Minotaur* treatment, however, contributes nothing new to the infringement inquiry because the treatment's shape-changing elements are also prominently featured in the screenplay considered by the *Green* court. Indeed, Green's screenplay was wholly based upon the Kourtises' treatment.

**[4]** The copyright infringement claim asserted by the Kourtises is therefore identical to the one adjudicated in the *Green* litigation.

2

**[5]** Collateral estoppel does not attach merely because the same issue is raised in successive suits. Indeed, "[w]e have in this nation a deep-rooted historic tradition that everyone should have his own day in court," and we accordingly presume that "a judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1050 (9th Cir. 2005) (inter-

nal quotation marks omitted). Because the Kourtises were not a party to the *Green* litigation, they are free to relitigate the copyright infringement issue unless they were in privity with Green.[4]

a

[6] Privity "is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *United States v. Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997) (internal quotation marks omitted). Because the concept of privity extends the reach of a judicial decision to nonparties and thereby deprives them of their own day in court, due process considerations make adequacy of representation a prerequisite to privity. Indeed, the Supreme Court has repeatedly emphasized that "it would violate the Due Process Clause . . . to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented." *Richards v. Jefferson County*, 517 U.S. 793, 794 (1996); *see also Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) ("Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").

[7] Privity was traditionally limited to several well-defined

---

[4]We need not discuss the second element of the collateral estoppel inquiry because all parties agree that the *Green* litigation, which concluded with a grant of summary judgment in favor of Cameron, terminated in a final judgment on the merits. *See Jackson v. Hayakawa*, 605 F.2d 1121, 1125 n.3 (9th Cir. 1979) (noting that summary judgment is a final judgment on the merits for preclusion purposes).

categories of relationships, including co-owners and co-tenants of property, assignors and assignees, and indemnitors and indemnitees. *See Headwaters Inc.*, 399 F.3d at 1053. Recent cases apply the privity concept in a much more flexible manner, however, and courts have found the existence of privity in an array of disparate circumstances summarized under the heading of "virtual representation." *See id.*

**[8]** The case law applying the virtual representation doctrine has been appropriately characterized as "episodic" and lacking any "clear pattern," and it is therefore difficult to distill a generally applicable framework from the relevant precedent. 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4457, at 513 (2d ed. 2002); *see also Headwaters Inc.*, 399 F.3d at 1053 n.5 (asserting that the "virtual representation concept is amorphous, illustrates the harm that can be done when a catchy phrase is used to describe a perfectly sensible result, and cast[s] more shadows than light on the problem to be decided" (internal quotation marks omitted; alteration in original)). Nevertheless, those relationships that courts have deemed sufficient to give rise to virtual representation do share certain features: "a close relationship, substantial participation, and tactical maneuvering all support a finding of virtual representation; identity of interests and adequate representation are *necessary* to such a finding." *Irwin v. Mascott*, 370 F.3d 924, 930 (9th Cir. 2004) (emphasis added).

In *Irwin*, for example, we concluded that a corporation was the virtual representative of its senior corporate officer. *Id.* at 931. In so holding, we emphasized that the officer was intimately involved in the earlier litigation and that there was "no assertion that [the officer's] interests diverged" from the corporation's. *Id.* at 930-31; *see also Trevino v. Gates*, 99 F.3d 911, 924 (9th Cir. 1996) (holding that a child who filed a § 1983 action against law enforcement officers premised upon the shooting death of her father was collaterally estopped from relitigating the punitive damages issue by her grand-

mother's earlier suit concerning the same events because the grandmother had a "tremendous incentive" to recover punitive damages).

In contrast, we held in *Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1405 (9th Cir. 1993), that two corporations, HITCO and Ladish, were not in privity with each other where Ladish had no participation in or control over the earlier suit against HITCO and there was "no indication that HITCO had any interest in Ladish's affairs or well-being during or after the lawsuit against HITCO."

[9] Regardless of whether privity is asserted upon one of the more traditional grounds or upon the basis of so-called "virtual representation," a conflict of interest between a non-party and his purported representative forecloses the possibility of privity because a nonparty cannot be adequately represented by a person with whom he is in conflict.[5] *See Tahoe-Sierra Pres. Council, Inc.*, 322 F.3d at 1082 ("if *there is no conflict between the organization and its members*, and if the organization provides adequate representation on its members' behalf, individual members not named in a lawsuit *may* be bound by the judgment won or lost by their organization" (first emphasis added)). In *Hansberry v. Lee*, 311 U.S.

---

[5]Cameron contends that adequacy of representation is not required to establish preclusion on the basis of a traditional privity category, such as assignor and assignee. This argument overlooks the weighty due process considerations that make adequacy of representation the *sine qua non* of any privity relationship. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1082 (9th Cir. 2003) (noting that one of the traditional relationships that may give rise to privity "is that of an organization or unincorporated association filing suit on behalf of its members," while cautioning that, "[o]f course, the organization must adequately represent the interests of its individual members if its representation is to satisfy the due process concerns articulated in *Hansberry v. Lee*"); *see also Richards*, 517 U.S. at 798 ("there are clearly constitutional limits on the 'privity' exception"); *Headwaters Inc.*, 399 F.3d at 1054 ("adequate representation is a due process prerequisite to precluding a litigant from his day in court if he was not a party to the earlier litigation").

32, 37 (1940), for example, a group of landowners sought to enforce a racially restrictive covenant against African-American property holders. The covenant was only operative if approved by 95% of the neighborhood's landowners, and the defendants contested its validity on that ground. *Id.* at 38. Relying upon a prior proceeding to which the African-American property holders were not a party, the Illinois courts held that the defendants' challenge was precluded because the litigants to the earlier case had stipulated that the requisite number of landowners had indeed assented to the covenant. *Id.* at 38-39.

The Supreme Court reversed and held that it was inconsistent with due process to bind the African-American property holders to that stipulation because none of the parties to the previous case had adequately represented their interests. *Id.* at 44. The Court emphasized that the plaintiffs in the earlier litigation were attempting to enforce the restrictive covenant, whereas the defendants in the present case were seeking to invalidate it. *Id.* at 45-46. On the basis of this conflict, the Court concluded that the African-American property holders had not been adequately represented by the prior plaintiffs. *See id.* ("In seeking to enforce the agreement the plaintiffs in [the earlier] suit were not representing the [African-American property holders] whose substantial interest is in resisting performance.").

Here, the district court premised the existence of privity upon the agency relationship that was created when the Kourtises hired Green to write the *Minotaur* screenplay. The court concluded that "Green's interests in the action are identical to the Kourtises' interests, and Green and the Kourtis plaintiffs share tremendous incentive to achieve a decision in their favor, namely, a determination that defendants infringed their copyrights." Dist. Ct. Order 9.

**[10]** While the district court is correct that both Green and the Kourtises have an interest in establishing that *Terminator*

*II* infringed upon *The Minotaur*, "parallel legal interests alone, identical or otherwise, are not sufficient to establish privity." *Headwaters Inc.*, 399 F.3d at 1054. Both "identity of interests *and* adequate representation are necessary." *Irwin*, 370 F.3d at 930 (emphasis added).

**[11]** The one-time agency relationship between Green and the Kourtises does not satisfy the adequacy-of-representation requirement. Green was not acting as the Kourtises' agent when pursuing his claim against Cameron: the Kourtises did not direct him to file suit and they did not stand to share in the recovery if he prevailed. *Cf. FTC v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004) (holding that res judicata bars a claim brought against an indemnitee if the same claim has already been pursued against the indemnitor *in its capacity as indemnitor*). Moreover, Green's litigating position was adverse to the Kourtises because it was premised upon the allegation that he—not the Kourtises—owned the *Minotaur* copyright. Thus, like the African-American property holders in *Hansberry* and the earlier litigants seeking to enforce the racially restrictive covenant, the Kourtises and Green are in conflict concerning a matter central to the issue on which preclusion is sought. In light of this conflict, it cannot be said that the Kourtises were adequately represented by Green during the earlier proceedings. Privity therefore did not exist between them.

b

**[12]** The fact that the Kourtises were aware of the *Green* litigation and failed to intervene does not affect our collateral estoppel analysis. There is no duty of mandatory intervention imposed upon nonparties, and the decision not to intervene thus does not expose a nonparty to the earlier proceedings' preclusive effects. *See* 18A Wright, Miller & Cooper, *supra*, § 4452, at 399 ("Rules on intervention such as [Fed. R. Civ. P.] 24 have not been drawn in compulsory terms. Intervention has been conceived as a device that permits a nonparty to become a party *when it wishes . . . .*" (emphasis added)).

*Martin v. Wilks*, 490 U.S. 755 (1989), illustrates the non-compulsory nature of intervention. There, a group of white firefighters brought suit challenging a city's affirmative action program, which had been implemented under a consent decree that terminated litigation in which the *Martin* plaintiffs had not participated. *Id.* at 758. Even though the white firefighters were aware of the prior suit and chose not to intervene, the Supreme Court held that they were not collaterally estopped by the earlier proceedings. *Id.* at 763. The Court explained that the

> law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger. . . . Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights.

*Id.* (internal quotation marks omitted; alteration in original). The Court concluded that "[j]oinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree." *Id.* at 765.[6]

**[13]** The onus therefore rested with Cameron to join the Kourtises to the *Green* litigation. The Kourtises themselves were under no obligation to intervene, and they are free to pursue their copyright infringement claim in this suit because they were neither parties to the *Green* case nor in privity with a party.

---

[6]Congress overrode the *Martin* decision in the specific context of employment discrimination suits when it enacted the Civil Rights Act of 1991, which provides that parties adversely affected by the judgment in an employment discrimination case may not institute a new action challenging that judgment if they had an opportunity to intervene in the earlier case. *See* 42 U.S.C. § 2000e-2(n). *Martin*'s holding remains intact outside of the employment discrimination setting.

B

Cameron asserts that there exist several alternative grounds for affirming the dismissal of the Kourtises' copyright infringement claim.

1

Cameron first argues that the Kourtises lack standing to pursue an infringement claim because they do not allege ownership of *The Minotaur*'s copyright. This contention is belied by the complaint, in which the Kourtises explicitly allege that they own the copyright to *The Minotaur*. *See* Compl. ¶ 11 ("In early 1987 F. and C. Kourtis developed original creative material concept for a feature film entitled 'The Minotaur' and wrote a treatment ('Kourtis Treatment'). They registered it in Australia with Worldwide Register of Copyright, Registration No. 20568."). The Kourtises' allegations satisfy the permissive requirements of notice pleading. *See* Fed. R. Civ. P. 8(a).

2

[14] Cameron also contends that the Kourtises' copyright infringement claim is barred by the Copyright Act's three-year statute of limitations. *See* 17 U.S.C. § 507(b). "A cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994). In a case of continuing infringement, however, "an action may be brought for all acts that accrued within the three years preceding the filing of the suit." *Id.*; *see also Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1038 (9th Cir. 2000) ("the [copyright] statute of limitations is triggered only by violations—*i.e.*, actual infringements").

[15] The Kourtises acknowledge in their complaint that they learned of Cameron's alleged infringement in 1991,

when *Terminator II* was released. This initial act of infringement indeed falls outside the statute of limitations. Nevertheless, the complaint also alleges several acts of continuing infringement, including the release of *Terminator II* on DVD and the use of the *Minotaur* materials to develop *Terminator III*. Because the complaint does not identify the date on which the Kourtises discovered these acts of continuing infringement, it cannot be concluded that the Kourtises' claim is time-barred in its entirety. *See Danjaq LLC v. Metro-Goldwyn-Mayer, Inc.*, 263 F.3d 942, 954 (9th Cir. 2001) (recognizing that the re-release of a movie on DVD could constitute a separate act of copyright infringement for statute-of-limitations purposes, even though the movie had originally been released decades before the plaintiff filed suit). Cameron is free, of course, to pursue the statute-of-limitations issue on summary judgment. *See Roley*, 19 F.3d at 482 (affirming a grant of summary judgment on statute-of-limitations grounds where the plaintiff's continuing infringement theory was premised upon "naked allegations and speculation").

3

Lastly, Cameron urges us to dismiss the Kourtises' copyright infringement claim on the basis of laches, an equitable defense that bars the claims of a plaintiff "who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC*, 263 F.3d at 950-51 (internal quotation marks omitted). A defendant asserting laches must establish both unreasonable delay by the plaintiff and prejudice to himself. *Id.* at 951.

The Kourtises' complaint simply does not provide sufficient factual allegations to conclude that they unreasonably delayed in filing suit and that Cameron was prejudiced by this delay. Indeed, "a claim of laches depends on a close evaluation of all the particular facts in a case," and it therefore "is seldom susceptible of resolution by summary judgment." *Kling*, 225 F.3d at 1041 (internal quotation marks omitted). At

the motion-to-dismiss phase, the obstacle to asserting a successful laches defense is even greater because the defendant must rely exclusively upon the factual allegations set forth in the complaint. Cameron's laches defense is therefore premature.

## III

We next consider whether it was proper for the district court to dismiss each of the Kourtises' state law claims on statute-of-limitations grounds.

## A

**[16]** Under California law, claims for breach of an implied or oral contract are governed by a two-year statute of limitations. *See* Cal. Civ. Proc. Code § 339(1) ("[a]n action upon a contract, obligation or liability not founded upon an instrument of writing" must be filed "[w]ithin two years"). Such claims accrue at the time of breach. *See Menefee v. Ostawari*, 278 Cal. Rptr. 805, 809 (Ct. App. 1991) ("a cause of action for breach of contract ordinarily accrues at the time of breach regardless of whether any substantial damage is apparent or ascertainable"); *In re Estate of Fincher*, 174 Cal. Rptr. 18, 23 (Ct. App. 1981) ("The general rule is that a suit for breach of an implied agreement accrues at the time of the breach.").

**[17]** The Kourtises allege that they entered into oral and implied contracts in which Cameron agreed to produce a project based upon the *Minotaur* materials. The latest date upon which their breach-of-contract claims could have accrued is 1991, when Cameron released *Terminator II*, which is more than a decade before this suit was filed. The Kourtises' attempt to extend the statute of limitations based upon a continuing violation theory akin to copyright's continuing infringement doctrine is unavailing because they do not cite—and we are not aware of—any precedent that supports such a result.

**[18]** Because the Kourtises waited more than a decade after the accrual of their breach-of-contract claims to file suit, such claims are barred by the statute of limitations.

### B

**[19]** The Kourtises' breach-of-confidence claim is likewise subject to a two-year limitations period. *See Rokos v. Peck*, 227 Cal. Rptr. 480, 489 (Ct. App. 1986) ("The statute of limitations for either [a] cause of action for breach of implied contracts or [a] cause of action for breach of confidence is identical . . . ."). The Kourtises' claim accrued when they first suffered "appreciable and actual harm," *Davies v. Krasna*, 535 P.2d 1161, 1169 (Cal. 1975), which again could be no later than the date on which *Terminator II* was released in 1991. Their breach-of-confidence claim is therefore untimely.

### IV

The district court erred when it held that the Kourtises are collaterally estopped from pursuing their copyright infringement claim, and we therefore reverse the dismissal of that claim. The district court correctly concluded, however, that the Kourtises' state law claims are barred by the statute of limitations, and we affirm that portion of the court's decision.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.[7]

---

[7]Each party shall bear its own costs on appeal. *See* Fed. R. App. P. 39(a)(4).